UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-20611-CR-GOLD/MCALILEY

UNITED STATES OF AMERICA,

     Plaintiff,

v.

LAVI RUBINSTEIN,

     Defendant.

                                   /

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE

The Defendant Lavi Rubinstein filed his Amended Omnibus Pretrial Motions to Suppress Evidence [DE 51], to which the government has filed a response in opposition [DE 53], and which has been referred to me for report and recommendation. [DE 52]. I held an evidentiary hearing on June 3, 2010, and also heard oral argument on the Motions at that time.[1] For the reasons expressed here, I recommend that the motions be granted in part, and denied in part.

### 1.    Background

The Defendant stands charged by Indictment with four counts of knowing transportation of child pornography in interstate and foreign commerce, and one count of possession of child pornography that had been transported in interstate and foreign

---

[1] The transcript of that hearing has been filed at DE 66, and is cited here as "[Tr. p. __]."

commerce, in violation of 18 U.S.C. § 2252(a)(1) and (a)(4)(B).  [DE 6].  The alleged

pornographic images that are the subject of these charges were found by the government on

two computers: a desktop computer at the Defendant's home, and a laptop computer that the

Defendant had with him on July 8, 2009, at the Miami International Airport, as he returned

home from travels abroad.  This Court issued search warrants authorizing the search of both

computers and the Defendant's home, and the Defendant moves to exclude from evidence

everything seized from those searches, as having been taken in violation of his Fourth

Amendment rights; he also seeks suppression of post-arrest statements he made after he was

placed under arrest at the airport.  The Defendant makes a multitude of arguments in support

of his Motions to Suppress, which I address in turn.

## 2.      Search of the Defendant's home, including his desktop computer

On June 24, 2009, this Court issued a search warrant for a single family home located

at 18241 N.E. 7th Court, North Miami Beach, Florida ("the home").  That home is the

residence of the Defendant and his parents.[2]  Special Agent Richard J. Wilkins of

Immigration and Customs Enforcement (ICE), of the Department of Homeland Security,

applied for the search warrant on the same day it was issued.  The warrant authorizes a search

of the entire home, and the seizure of sixteen numbered items, that are listed on Attachment

---

[2] At the suppression hearing the Defendant was not willing to concede that this was his home
at the time the search warrant was executed.  Without resolving that question, I refer to it here as his
home.

B to the search warrant.[3]

### a.     The search warrant and application

The following paragraphs in the search warrant set forth the specific evidence Agent

Wilkins offered about the Defendant, and relied upon to establish probable cause.

> 5.   On or about June 3, 2009, I received information from the Immigration and Customs Enforcement (ICE) Resident Agent in Charge (RAC) Jackson, Mississippi office that a person in the ICE Special Agent in Charge (SAC) Miami, Florida area of operation had transmitted and received child pornography with a person in Mississippi.  As I explain below, I have probable cause to believe that the person who transmitted the child pornography to the person in Mississippi is LAVI RUBINSTEIN, of 18241 NE 7th Ct, North Miami Beach, Florida 33162 (the "Premises").

> 6.  On January 15, 2009, ICE Agents executed a federal search warrant at a residence in Crystal Springs, Mississippi.  The occupant of the residence was identified as Robert MORRIS.  MORRIS was interviewed and admitted to sending and receiving images of child pornography via the internet using internet sites, Google Hello and Yahoo.

> 7.  On January 29, 2009, a Computer Forensic Agent discovered the Google Hello chat logs between MORRIS and a person using the Google Hello user ID 1631922 and a Google Hello handle "pimpstrudel", using the email address of bigtata666@hotmail.com.  Pimpstrudel was later identified as LAVI RUBINSTEIN, and it was determined that MORRIS and RUBINSTEIN had chats that contained sexually explicit conversations while transporting and receiving images of child pornography.

> 8.  On April 9, 2008, an individual using the "pimpstrudel"handle transported approximately 33 pictures of child pornography to MORRIS.  One picture is of a naked prepubescent girl lying on a bed with her legs open.  The picture was taken around the knees of the girl with the focus appearing to be her genitalia.

---

[3] This search warrant and application, and the application and warrant for the laptop computer, have been filed with the Court at DE 45-1.

9. On April 15, 2008, an individual using the "pimpstrudel" handle transported approximately 124 pictures of child pornography to MORRIS. One picture was of a[n] approximately 4 year old naked girl on the lap of an unidentified adult with her legs spread open. The adult is rubbing the girl's vagina.

10. On May 30, 2008,[4] an individual using the "pimpstrudel" handle transported approximately 125 pictures of child pornography to MORRIS. One picture sent is of an adult male ejaculating into the mouth of a girl that is approximately 3 years of age. The picture is embedded with the title (pthc lolifuck)_3yo_carseart_cumface.jpg.

11. On or about May 27, 2009, ICE agents received a subpoena response from Microsoft indicating that Lavi RUBINSTEIN is the subscriber to the bigtata666@hotmail.com email account. This is the e-mail address registered to the "pimpstrudel" handle. Microsoft's records showed that on November 21, 2008, at 1:58:04 a.m. (PST) the IP address utilized by bigtata666@hotmail.com was 74.173.134.157.

12. On or about June 9, 2009, ICE agents received a subpoena response from AT&T Southeast indicating that the IP address of 74.173.134.157 on November 21, 2008, at 1:58:04 a.m. (PST) was issued to the account of Henry Rubinstein at the address of 18241 NE 7th Ct. North Miami Beach, Florida 33162. And, the records show that the account is still active.

12.[5] In addition, I researched Florida State driver's license records for information on LAVI RUBINSTEIN. They show that RUBINSTEIN was born on July 4, 1984, and that he lives at 18241 NE 7th Ct. Miami [sic], Florida 33162.

13. On June 19, 2009, I conducted surveillance on the residence at 18241 NE 7th Ct. Miami [sic], Florida 33162. I observed a 2005 Chevy Aveo parked in front of the Premises. A records check of the license plate number shows the vehicle registered to Henry Rubinstein.

---

[4] The government acknowledged that this date was an error; the correct date is May 3, 2008.

[5] Two paragraphs were numbered "12."

4

14. Neighbors of Levi [sic] RUBINSTEIN have placed him outside the PREMISES, and commercial databases such as AUTO-TRACK indicate that the PREMISES is Levi [sic] Rubinstein's current address.

[DE 45-1, pp. 3-5]. Agent Wilkins relied on this information about the Defendant for his sworn belief that "probable cause exists that RUBINSTEIN used a computer inside the Premises to violate" the child pornography statutes. [DE 45-1, p. 2, ¶ 2]. Agent Wilkins sought a warrant "authorizing a search of the entire Premises, including the residential dwelling and any computer and electronic storage media inside the Premises." [DE 45-1, p.2, ¶ 3].

In a section titled "Computers and Child Pornography," Agent Wilkins described how computers are often used by persons who possess and transmit images of child pornography [DE 45-1, pp. 5-7, ¶¶ 15-18], and under the heading "Specifics of Search and Seizure of Computer Systems" he described steps law enforcement officers must frequently take to search computers and to retrieve evidence authorized to be seized by a search warrant [DE 45-1, pp. 7-9, ¶¶ 19-20]. Agent Wilkins concluded that based on the information he offered in the affidavit, probable cause existed to search the home for child pornography. [DE 45-1, ¶ 21]. Agent Wilkins asked the court to authorize the search for, and seizure of, sixteen categories of information listed on Attachment B to his application. The application was granted, and the warrant was issued as requested, with Attachment B being made a part of the warrant itself.

5

The Defendant argues that the warrant was issued contrary to the requirements of the Fourth Amendment, in the following ways: (1) the information in the search warrant application did not amount to probable cause; (2) the application included information obtained in violation of the Defendant's statutory and constitutional rights; (3) the government exceeded its authority when it executed the search warrant; (4) the warrant authorized an overly broad and general search; (5) the government unreasonably delayed in completing its search of the computer data.

### b.     Probable cause

The Fourth Amendment requires that search warrants be issued only "upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In his Motion, the Defendant dismantles Agent Wilkins' application, almost line-by-line, challenging gaps in information, inferences the reader is asked to make, conclusions drawn, sources of information and small errors, and argues that the application did not establish probable cause that evidence of the suspected crime would be found at his residence.

In its review of Agent Wilkins' application, this Court is confined to the content of that application. *Aguilar v. Texas*, 378 U.S. 108, 109 n.1 (1964) ("It is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention.") (citation omitted); *United States v. Lockett*, 674 F.2d 843, 844 (11th Cir. 1982). This Court also is obligated to pay great deference to the issuing

6

judge's determination of probable cause:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found at a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

I find that the Magistrate Judge who issued this warrant had "a substantial basis" to conclude that there was "a fair probability" to believe that evidence of the unlawful possession or transportation of child pornography would be found at the Defendant's home, and in particular, on his computer.

In the numbered paragraphs set out above, Agent Wilkins gave his reasons for believing that the Defendant had unlawfully possessed numerous images of child pornography, and had transmitted those images over the Internet using a personal e-mail account, and that evidence of this was likely to be found at his home. Agent Wilkins explained that about three weeks before he wrote his application, an ICE counterpart in Mississippi notified him that a search warrant had been executed in Mississippi some six months earlier (in January, 2009), at the home of a man named Robert Morris, who had admitted to sending and receiving child pornography images over the Internet. The Mississippi agents discovered Google Hello chat logs between Morris and a person with the

7

screen name "pimpstrudel" who used email address bigtata666@hotmail.com. Agent Wilkins detailed three particular transmissions sent by pimpstrudel to Morris, in April and May, 2008 (a little more than a year before Agent Wilkins made his application), of a total of nearly two hundred child pornographic images. In his application, Agent Wilkins described one image in each transmission, for the purpose of illustrating his conclusion that the images constituted child pornography.[6]

Agent Wilkins stated that pimpstrudel was later identified as the Defendant, and he went on to summarize the process by which he came to that conclusion. Specifically, he wrote that on May 27, 2009 (about a month before he applied for the warrant) he subpoenaed Microsoft and determined that the Defendant was the subscriber to the bigtata666@hotmail.com email account, and stated "this is the email address registered to the pimpstrudel handle." [DE 45-1, p. 4, ¶ 11]. He further stated that Microsoft records identified the IP address used by that email account on November 21, 2008.

Agent Wilkins next subpoenaed AT&T and learned that on that same November 2008 date, the IP address was issued to an account in the name of Henry Rubinstein[7] at the home

---

[6] Although the application does not say this, the clear inference is that Morris's computer was seized during the search of his home, and later analyzed, and that these three transmissions came to light from the forensic review of Morris's computer.

[7] The government acknowledges that this too was an error, and the account was, in fact, in the name of Patty Rubinstein.

that was the subject of the search warrant application.[8]  Further, AT&T records showed that, as of two weeks before he made out his application, the Internet provider account at the Rubinstein home was still active.

To further link the Defendant to the home, Agent Wilkins did several other  things. First, he checked Florida drivers license records, which revealed that the Defendant lived at the home.  Second, he conducted surveillance of the home, five days earlier, where he saw a vehicle, and checked records of that license and learned that it was registered to Henry Rubinstein.  Third, Wilkins spoke with neighbors who said they had seen the Defendant outside the home, and fourth, he searched commercial databases which documented that the Defendant's current address was the home.

The Defendant argues that there are too many gaps in this information for the Court to have concluded that  evidence of child pornography crimes would be found at the home. First, he contends that the evidence of his transmissions of child pornography was a little more than a year old, and therefore any probable cause that may have at one time existed, was stale.  No doubt, information "must be timely . . . for probable cause must exist at the time the magistrate judge issues the search warrant."  *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994).

---

[8] An IP address (Internet Protocol address) is a unique series of numbers that identifies a computer participating in a computer network.  While some IP addresses are static, that is they are repeatedly used by the same computer, often IP addresses are dynamic, that is a different number is assigned to a computer each time it is used.  Thus, on this point this application proved only this: that on one occasion in November, 2008, someone accessed the hotmail account subscribed to by the Defendant from the Rubinstein home.

> When reviewing staleness challenges we do not apply some talismanic rule which establishes arbitrary time limitations for presenting information to a magistrate, rather, we review each case based on the unique facts presented. In this case-by-case determination we may consider the maturity of the information, nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched.

*Id.* (internal citation omitted). According to the application, some thirteen months before the search warrant was executed, the Defendant emailed 125 images of child pornography. The Defendant is correct that the search warrant application provides no evidence that the Defendant engaged in other transmissions in the following months, and unfortunately Agent Wilkins did not expressly state why he believed evidence of these alleged crimes would still be found at the home a year later.

The court's assessment of probable cause should not ignore "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Illinois v. Gates*, 462 U.S. at 241 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)); *see also United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994). Here, the nature of the suspected crime strongly suggests that the Defendant would continue to possess images of child pornography, and that he would do so at his home, and most likely on his personal computer. Numerous courts have taken notice of the fact that persons who trade in child pornography often make efforts to collect and store those images, and those who do so via the Internet typically keep that information on their personal computer, a relatively secure and accessible storage medium. Because the images are prohibited, and there is risk

10

associated with acquiring them, they are commonly held for long periods of time. *See United States v. Schwinn*, Case No. 08-14592, 2010 U.S. App. LEXIS 8851 (11th Cir. April 28, 2010). [9] In this Court's experience with cases of this nature, that principle has held true. Here, the Court was provided evidence that the Defendant had transmitted the images by email; thus it stood to reason that by far the most likely place these and other images might be found would be on the Defendant's computer.

In considering the Defendant's claim that any probable cause was stale, the Court can not take in isolation the last known (May, 2008) Internet transmission. In fact there were three transmissions: and it is significant that within a one-month period the Defendant emailed images to Morris three times. The fact that he did so repeatedly, and that each transmission had many images (ranging between 33 and 125), strongly suggests these were not isolated incidents. Moreover, these numbers suggest the Defendant had a large collection of child pornographic images. The search warrant application confirmed that the AT&T Internet account at the Rubinstein residence, that had been used on at least one occasion to access the Defendant's hotmail account, was still active at his home. Taken together, this

---

[9] *See also United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008) ("customers of child pornography sites do not quickly dispose of their cache."); *United States v. Irving*, 452 F.3d 110, 125 (2nd Cir. 2006) ("the staleness determination is unique because it is well known that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes."); *United States v. Riccardi*, 405 F.3d 852, 861 (10th Cir. 2005)(same); *United States v. Ricciardelli*, 998 F. 2d 8, 12 n.4 (1st Cir. 1993) ("exigent circumstances will rarely, if ever, be present in child pornography cases, as history teaches that collectors prefer not to dispose of their dross, typically retaining obscene materials for years.")

11

evidence created a "fair probability"[10]   that child pornography, or evidence of the Defendant's alleged crimes, would be found at his home, and in particular on his computer, thirteen months after his last known transmission.

The Defendant offers other critiques of the search warrant application. He argues that the application did not adequately link the handle pimpstrudel to the bigtata666@hotmail.com email address, or link them to the home. I do not agree. The Microsoft records documented that the Defendant was the subscriber to the email address, and that he used the username pimpstrudel.   Moreover, Agent Wilkins put forth redundant evidence that the Defendant lived at the home, and demonstrated that as of a couple weeks before the warrant was executed, the home maintained an active Internet account. Those records also showed that, at least on one occasion in November 2008, the Defendant's hotmail account was accessed from a computer at that home.

The Defendant correctly notes that Agent Wilkins did not establish that the three transmissions of child pornography to Robert Morris were sent using a computer at the home, nor did he offer any direct evidence that the Defendant in fact stored images of child pornography at that home. Probable cause, however, did not require this proof.

> [I]n judging the sufficiency of an affidavit to determine whether probable cause exists, we assess not the individual facts but the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers.  Viewing the evidence in this manner it may truly be said that the total may be a sum greater than its parts.

---

[10] *See Illinois v. Gates*, 462 U.S. at 238-39.

12

*United States v. Flynn*, 664 F.2d 1296, 1304 (5th Cir. 1982) (citations and quotations omitted). In this case, the total significance of the information provided in Agent Wilkins' affidavit is greater than the sum of its individual parts and it gave the judge a "substantial basis" to conclude that there was a "fair probability" that evidence of the suspected crimes would be found at the Defendant's home. *Illinois v. Gates*, 462 U.S. at 238-39. This was enough.[11]

The Defendant next complains that the issuing judge did not look at any of the alleged child pornography, and thus could not have made a probable cause finding in this regard. In this Circuit there is no requirement that judges who issue search warrants in child pornography cases inspect the alleged pornographic images themselves. Only one Circuit prefers that inspection when possible, *see United States v. Brunette*, 256 F. 3d 14, 19 (1st Cir. 2001); while other Circuits have explicitly held that issuing judges need not personally view the images, but may rely on a reasonably specific descriptions. *See United States v.*

---

[11] Defendant also faults Agent Wilkins for not having attached to his application copies of the subpoena to Microsoft, or the information Microsoft sent in return. The probable cause requirement does not demand that search warrant applications include original evidence for the Court's independent inspection. Rather, Courts may rely on the veracity of sworn statements included in a warrant application. *In re United States v. Trinity Industries, Inc.*, 876 F. 2d 1485, 1493 n. 4 (11th Cir. 1989). The Defendant also complains that the application did not report the time frame during which the email account was maintained with Microsoft, and that the application did not demonstrate that "the chats found on Morris' computer were actually genuine, that they *actually had been transmitted, with the pictures, over the Internet, i.e., in interstate commerce.*" [DE 51, p. 15-16] (emphasis in original). With criticisms such as these, the Defendant reveals his fundamental misunderstanding of the expectations of a search warrant application. The application need not document with hard evidence every single link in the chain of inquiry; rather, reasonable inferences can be drawn.

13

*Gatherum*, 338 Fed. Appx. 271, 274 (4th Cir. 2009); *United States v. Lowe*, 516 F. 3d 580, 586 (7th Cir. 2008); *United States v. Battershell*, 457 F. 3d 1048, 1052 (9th Cir. 2006); *United States v. Chrobak*, 289 F. 3d 1043, 1045 (8th Cir. 2002).[12]

Along the same lines, the Defendant argues that Agent Wilkins' sample descriptions of two of the three images sent from pimpstrudle to Morris, do not meet the definition of "sexually explicit conduct" set forth in 18 U.S.C. § 2256 (2)(A).[13] Sexually explicit conduct, an element of the suspected crimes, is defined at 18 U.S.C. § 2256(2)(A) to include "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A)(v).[14] I have reviewed the descriptions of the three images, in paragraphs 8, 9 and 10 of the application, and conclude that the Magistrate Judge had a substantial basis to conclude that they met the definition of sexually explicit conduct, and thus I reject this challenge to the warrant application.

Finally, the Defendant also points out a few factual errors: the statement that the computer account was in the name of Henry Rubinstein, when in fact it was in Patty

---

[12] Indeed, a number of years ago the Supreme Court observed: "we have never held that a magistrate must personally view allegedly obscene films prior to issuing a warrant authorizing their seizure. On the contrary, we think that a reasonably specific affidavit describing the content of a film generally provides an adequate basis for the magistrate to determine whether there is probable cause to believe that the film is obscene, and whether a warrant authorizing the seizure of the film should issue." *New York v. P.J. Video, Inc.*, 475 U.S. 868, 874 n. 5 (1986) (citation omitted).

[13] The Defendant concedes that the description of the picture transmitted on May 3, 2009, meets the definition. [DE 51, p. 17, n. 28].

[14] "Lascivious" is defined as "1. Given to or expressing lust; lecherous. 2. Exciting sexual desires; salacious." American Heritage Dictionary, 988 (4th ed. 2006).

14

Rubinstein's name, the reference in Attachment B to "Target User," a term that was not

defined elsewhere in the warrant or application but which could only reference the

Defendant, and the reference to the email transmission of images on May 30, 2008, when the

correct date was May 3, 2008. Each of these errors is of no significance, as they do not

undermine a finding of probable cause.

> [M]inor discrepancies in an affidavit should not subvert an officer's good-faith
> revelations of facts establishing probable cause. *See, e.g., Illinois v.
> Rodriguez*, 497 U.S. 177, 184-85 (1990) (Factual inaccuracies in warrant do
> not negate reasonableness of search.); *Maryland v. Garrison*, 480 U.S. 79, 88
> (1987) (Warrant still valid if inaccuracies in affidavit are "objectively
> understandable and reasonable.")

*United States v. Glinton*, 154 F.3d 1245, 1256 (11th Cir. 1998).

Thus, I reject the Defendant's arguments that the search warrant application did not

establish probable cause.

### c. Information obtained from Microsoft and AT&T

According to the Defendant, the information obtained by subpoena from Microsoft

and AT&T was gotten in violation of his

> constitutional rights of privacy and against unreasonable searches and seizures
> because they were conducted without warrant and by summons, in violation
> of the *Stored Communications Act* 18 U.S.C. § 2701; *Electronic
> Communications Privacy Act* of 1986, 18 U.S.C. § 2701; and *Right to
> Financial Privacy Act*, 12 U.S.C. § 3402. Defendant submits that these
> summons were *ultra vires* acts of the ICE, in violation of the aforementioned
> acts, and in violation of his Fourth Amendment right against unreasonable
> searches and seizure and constitutional right of privacy.

[DE 51, p. 16]. The Defendant cites no authority to support these claims, and acknowledges that other courts have explicitly rejected them. [DE 51, p. 16, n. 27]. Accordingly, I find these claims to be without merit.

### d.     Government authority to execute the warrant

The Defendant challenges Agent Wilkins' authority to investigate child pornography crimes, noting that his application did not cite his statutory authority for doing so. [DE 51, p. 3, n. 1]. In fact, ICE agents can investigate these crimes, *see* DE 63; and it is not necessary for each search warrant applicant to provide citations to their statutory law enforcement authority.

### e.     General and overbroad warrant

In his Motion, the Defendant claims that the warrant fails because it is a general warrant, and because it authorizes an overbroad search, and offers this as a reason for the suppression of all evidence seized from the home. [DE 51, p. 2].

The notion of a general warrant derives from the Fourth Amendment's particularity requirement, which is meant to prevent the issuance of warrants that "authorize a general exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971); *United States v. Wecht*, 619 F. Supp. 213, 232 (W.D. Pa. 2009) (the problem with a general warrant is that it permits the executing officers to use their unbridled discretion to explore a person's belongings in search of criminal evidence). "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the

16

things authorized to be seized." *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982) (citations omitted).       While the Defendant has critiqued the sixteen-category Attachment B in extraordinary detail, and complains that many categories are "open ended" [DE 51, p. 22], he does not advance a credible argument that any of those categories amount to a general warrant.[15]  I have carefully reviewed each item on Attachment B, and find nothing that meets the criteria of a general warrant.  The requirement of particularity requires that the warrant guide the officers executing the warrant in what may be seized, but does not require descriptions to a degree of scientific certainty.  This warrant did just that.

Overbroad warrants authorize the seizure of things for which there is no probable cause, *United States v. Wecht*, 619 F. Supp. 213, 232 (W.D. Pa. 2009) (citations omitted). Overbroad warrants do not suffer from lack of particularity - the place to be searched or the things to be seized, are clearly identified - rather their search or seizure is not justified by the warrant.  The Defendant argues that the place to be searched (the entire home) and the items authorized for seizure are overbroad [DE 51, p. 20-21], and for the latter argument, in the case of two of those items, I agree.

---

[15] The closest he comes might be his critique of item no. 9 which authorizes seizure of "any and all notes, documents, records, or correspondence, in any format or medium . . . concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members." [DE 45-1, p. 14]. The Defendant argues that "[n]o guidance is given as to which groups this language refers." [DE 51, p. 23]. I think this provision provides enough direction to the officers executing the warrant so that they could reasonably identify evidence that falls within it.

Defendant first complains that the application did not justify a search of the entire residence. Defendant correctly notes that Agent Wilkins had reason to think that other persons lived at the home (the Internet account was registered to Patty Rubinstein and the Chevy Aveo was registered to Henry Rubinstein), who were not implicated in criminal conduct. Defendant argues that any search should have been be limited to the Defendant's room or property, precluding a search of the other occupants' rooms or possessions. Citing *United States v. Perez*, 484 F. 3d 735, 741 (5th Cir. 2007), the Defendant likens this warrant to those for premises with multiple units, where the warrant must specify the precise unit to be searched. That decision however, notes an exception to this rule, when "the targets of the investigation have access to the entire structure." *Id.* Here, the search warrant authorized the search of a single family home, and from the warrant application there was every reason to believe that the occupants were not restricted to particular rooms within that home.

There is considerable support for the notion that "'[a] search warrant for the entire premises of a single family residence is valid, notwithstanding the fact that it was issued based on information regarding the alleged illegal activities of one of several occupants of a residence.'" *United States v. Esterline*, 287 Fed. Appx. 693, 699 (10th Cir. 2008) (quoting *United States v. Kyles*, 40 F.3d 519, 523-24 (2nd Cir. 1994). *See also United States v. Romo-Corrales*, 592 F.3d 915, 920 (8th Cir. 2010) (search warrant authorized seizure of documents, which could fit into small spaces, this justified thorough search of entire residence); *United States v. Ayers*, 924 F.2d 1468, 1480 (9th Cir. 1991) (rejects argument that search of home

should have been confined to rooms occupied by suspected drug dealer); *United States v. Canestri*, 518 F.2d 269, 273 (2nd Cir. 1975) (Defendant's argument would suggest that "the purpose of a search warrant could be frustrated by the mere declaration of the owner of a one-family residence that one of the rooms therein 'belongs' to a party not named in the warrant.") In this case, the evidence authorized for seizure might have been found in any room in the home, and the warrant was not overbroad in allowing the agents to search throughout the house for those items.

Next, Defendant contends that the sixteen numbered categories of things that could be removed from the home, listed on Attachment B, included things for which there was no probable cause. His core argument is that the information provided in the application, at most, justified a search for the actual images that pimpstrudel sent to Morris back in April and May, 2008. In the Defendant's eyes, everything else that the warrant authorized for seizure was not supported by probable cause, and therefore those sections of the search warrant were overbroad.

Agent Wilkins' application can not be read that narrowly. It presented evidence that the Defendant had illegally transmitted and received, over the Internet, child pornography, and it supports a search for evidence of that crime, regardless of when the transmission or possession took place. Evidence of the suspected criminal conduct might be found, for example, in earlier or later, transmissions of child pornography, in records that indicate the Defendant's access to Internet sites or other sources of child pornography, or possibly in the

Defendant's own notes or other personal records. Evidence of this criminal conduct would not be limited to contraband,[16] but would also include, for example, records that linked the Defendant (through access or control) to particular computers, or to the residence itself. Thus, the Defendant's claim that the warrant should have been limited to evidence of the April and May, 2008 transmissions, is without merit.[17]

The Defendant goes further and critiques the sixteen categories of items authorized for seizure, demanding a level of precision that, quite simply, is beyond what is required by law. [*see* DE 51, pp. 6-9, 22-23]. I have reviewed those challenges with care, and reject them as without merit, with the exception of items 12 and 13. Item 12 authorized the seizure of "any and all cameras, film, videotapes or other photographic equipment." [DE 45-1, p. 13]. This is overbroad. While it may well have been reasonable to authorize the seizure of cameras and film, for later inspection for images of child pornography and seizure of those images only, there was no probable cause to seize all film, much less all videos, even those,

---

[16] The Supreme Court has recognized that all child pornography is illegal. *United States v. Williams*, 553 U.S. 285 (2008). Child pornography, like all contraband, is fairly authorized for seizure.

[17] The unreasonableness of this argument is perhaps more readily understood in the context of a prototypical search warrant for drugs. Those search warrants typically present evidence, often gathered from informants or undercover officers, that a putative defendant has brought or sold cocaine, for example, on particular occasions, offering reasons to believe that evidence of illegal drug sales, such as drugs, money, notes and ledgers, packaging materials, scales, etc., may be found at a particular location. A properly issued search warrant does not limit seizure to the cocaine from the particular transaction known to the government and identified in the warrant application, or to records of that particular transaction. In fact, it does not limit seizure to only cocaine, but authorizes the seizure of any illegal drugs. Similarly, this search warrant application reasonably supported the seizure of any child pornography, including evidence of the possession or transmission of any child pornography, as more particularly described by the search warrant.

to make the point, marked as Disney films. Item 13 suffers from the same problem: it authorizes seizure of "any and all depictions of minors." [*Id*.]. This would include family photo albums, framed baby pictures, magazines, books and films. There was no probable cause to support this broad seizure.

The general rule is that evidence seized pursuant to a general or overbroad warrant should be excluded from the defendant's trial. *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000) (citing *Stone v. Powell*, 428 U.S. 465, 486 (1976)). The Supreme Court, in *United States v. Leon*, 468 U.S. 897 (1984), however, established what has become known as the good-faith exception to the exclusionary rule, to be applied when law enforcement officers executing the warrant act "in the objectively reasonable belief that their conduct does not violate the Fourth Amendment." *Id*. at 918. This Circuit has squarely held that the good-faith exception applies to general and overbroad search warrants. *See e.g., United States v. Cruse*, 343 Fed. Appx. 462 (11th Cir. 2009) (general warrant); *United States v. Haynes*, 160 Fed. Appx. 940, 943-44 (11th Cir. 2005) (overbroad warrant); *Travers*, 233 F.3d at 1330 (overbroad warrant).

Law enforcement does not act in objective good faith, however, if the warrant is so overly broad on its face that the executing officers could not have reasonably presumed it to be valid. *Travers*, 233 F.3d at 1330 (citing *United States v. Accardo*, 749 F. 2d 1477, 1481 (11th Cir. 1985)). This warrant is not so facially deficient.[18] In fact, some of the evidence

---

[18] There are three other well-recognized exceptions to the good faith doctrine. *See Cruse*, 343 Fed. Appx. at 464. Defendant has not suggested that any of those exceptions apply here, nor

authorized for seizure by items 12 and 13 (had these sections of the warrant been drafted in a more narrow fashion), would have been supported by probable cause. For example, digital cameras or film might have been searched for sexually explicit images of children. Photographs of minors, even those that were not sexually explicit, might be evidence of the Defendant's suspected crime if, for example, they depicted children who were displayed in pornographic photos found in his possession, thereby indicating that the Defendant produced the pornographic images, or knew the victims of those images. In other words, while items 12 and 13 were overbroad, it can not be said that no reasonable officer could have relied upon this warrant, and thus the overbreath of these two provisions is saved by the good faith exception.

### f.    Length of search of the computer

The Defendant argued that government took too long to complete its forensic examination of the desktop computer, and that this too justifies suppression of the data taken from that computer.

The search warrant was executed on July 1, 2009. Two agents testified at the suppression hearing that ICE agents created a mirror image of a terabyte hard drive that same day, and of a 750 gigabyte hard drive the following day, July 2nd. The report of the forensic examiner, signaling the completion of the search of that computer, was dated November, 10, 2009, some four months after the computer was seized. [Tr. pp. 37-38; 42; 116]. The

_____

would the record before this Court support such a finding.

question presented then, is whether the four months devoted to searching the desktop computer was so unreasonable as to justify the suppression of the evidence retrieved from that computer.

The forensic exam was directed by ICE Special Agent Jorge Rodriguez, who did not testify at the hearing. [Tr. p. 37]. Agent Wilkins, however, did testify, and he witnessed some of Agent Rodriguez's forensic exam [TR. p. 94], and assisted him with that search while Agent Rodriguez was on vacation. [Tr. p. 101]. According to Agent Wilkins, the forensic examiner began his search within days of the hard drives being imaged, [Tr. p. 117], and focused his search on pictures and movies, conducted word searches (such as for "bigtata", "pimpstrudel" and other names associated with the investigation), and searched for Google Hello chats, which was particularly time-consuming, because they had been deleted. [Tr. 94-5; 117-18].[19] Moreover, the desktop computer was found to have 70 gigabytes of encrypted drive, a portion of which was sent to the agency headquarters in an effort to decrypt it, which was unsuccessful, but which made the search particularly time-consuming. [Tr. pp. 116-18].

Rule 41 requires that search warrants be executed within fourteen days, but specifically provides that in the case of computer search warrants that this deadline "refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review." Fed. R. Crim. P. 41(e)((2)(B). Here, the off-site imaging of the hard

---

[19] For Agent Wilkins' testimony regarding the search, see Tr. pp. 94-106; 116-18.

drive occurred within the fourteen day period as required by the Rule.

The Fourth Amendment itself contains no requirements about when the search or seizure is to occur, or the duration. *United States v. Gerber*, 994 F.2d 1556, 1559-60 (11th Cir. 1993). "However, 'unreasonable delay in the execution of a warrant that results in the lapse of probable cause will invalidate a warrant.' *United States v. Syphers*, 426 F. 3d 461, 469 (1st Cir. 2005) (quoting *United States v. Marin-Buitrago*, 734 F. 2d 889, 894 (2nd Cir. 1984)). Here, probable cause was unaffected by the delay, as the data on the computer was properly preserved. Moreover, the government offered a reasonable explanation for the time taken in this search. Various courts have rejected challenges to prolonged forensic searches of computers, recognizing, among other things, the complexity of the task. *See e.g., Syphers*, 426 F.3d at 469 (five-month search); *United States v. Burgess*, 576 F.3d 1078, 1096-97 (10th Cir. 2009) (forty-four day search); *United States v. Gorrell*, 360 F. Supp. 2d 48, 55 n.5 (D.D.C. 2004) (ten-month search); *United States v. Triumph Capital Group, Inc.*, 211 F.R.D. 31, 66 (D. Conn. 2002) (eight month search). This record does not support a finding that the length of the search was unreasonable.

In sum, having carefully considered each argument offered in support of Defendant's Motion to Suppress the search warrant issued for his home, I recommend that that Motion be denied.

## 3. Search of the laptop computer

While the ICE agent's search of the desktop computer was ongoing, they learned that

24

the Defendant would be returning from a trip to Spain, arriving at the Miami International Airport, on July 8, 2009. ICE Special Agent Alvaro Flores testified at the suppression hearing[20] that someone from ICE notified Customs and Border Protection (CBP) officials at the airport of the Defendant's anticipated arrival, and requested that upon his arrival CBP conduct a secondary inspection of the Defendant and his possessions, to search for contraband. Agent Flores, who has computer forensic expertise, went to the airport on July 8th, accompanied by his colleague, Special Agent Scott Lowen, where they encountered the Defendant in the secondary inspection area, during CBP's search. The Defendant had traveled with a laptop computer, which Agent Flores took to a room within the secondary inspection area. Agent Flores had brought with him to the airport a government-issued laptop equipped with EnCase forensic software, and related tools. He removed the hard drive from the Defendant's laptop and then used his own equipment to conduct what the government called a preview search of the Defendant's hard drive. With his equipment Agent Flores was able to examine the Defendant's hard drive without having to power on, or alter, any data on his computer. He found, in the course of this search, images of child pornography on that hard drive. Agent Flores testified that he, rather than the CBP officers, conducted this search because the CBP officers did not have the equipment or expertise to do the same.

---

[20] Agent Alvaro's testimony is found at Tr. pp. 25-92.

Agent Flores then took custody of the Defendant's laptop computer, and placed the

Defendant under arrest. Forty-one days later, on August 18, 2009, Agent Flores applied for

a warrant to search the laptop computer. His affidavit in support of that application is nearly

identical to Agent Wilkins' affidavit offered in support of the earlier warrant. In particular,

the first nine paragraphs quoted verbatim earlier in this opinion, were restated by Agent

Flores in his affidavit. The only substantive information that he added, to support this

warrant application, was the following three paragraphs:

> 14. On July 1, 2009, ICE agents executed a federal search warrant at
> RUBINSTEIN'S residence. Several computers were encountered in the
> residence and a preview of those computers was conducted pursuant to the
> search warrant. The search uncovered several images and movies depicting
> child pornography within a computer identified as RUBINSTEIN'S.
> RUBINSTEIN was currently out of the United States and was not interviewed
> or encountered.

> 15. Furthermore, on July 18, 2009,[21] Customs and Border Protection
> (CBP) and ICE agents intercepted RUBINSTEIN as he arrived into Miami
> International Airport from Madrid, Spain. CBP conducted a secondary
> examination of RUBINSTEIN'S luggage and items under his possession.
> RUBINSTEIN indicated that his luggage and items under his possession
> belong to him. CBP identified a laptop computer, which RUBINSTEIN
> indicated belonged to him.

> 16. On that same date, ICE agents were present to conduct a preview
> of RUBINSTEIN'S laptop computer for possible contraband. The preview of
> RUBINSTEIN'S laptop revealed several images and movies depicting child
> pornography. The AUSA's office was notified and concurred with the arrest
> of RUBINSTEIN. The laptop computer containing that child pornography was
> seized and securely stored by ICE.

---

[21] This date is an error; the correct date is July 8, 2009.

26

[DE 45-1, p. 27]. Agent Flores then included in his affidavit the same language about "Computers and Child Pornography" and "Search Methodology to be Employed" found in Agent Wilkins' affidavit. Agent Flores' affidavit ended with a simple conclusion, like that found in Agent Wilkins', that there was probable cause to believe that the laptop had been involved in the possession etc. of child pornography, and that evidence of that crime would be found on that computer. Agent Flores asked for authority to search the laptop and seize 12 numbered items listed on Attachment B to his Affidavit.[22] On August 18, 2009, the Court issued the requested search warrant for the laptop, with the same Attachment B, and authorized the seizure of the requested items.

In his Motion to Suppress the evidence seized from the laptop computer, the Defendants raises various arguments.[23] I find one of those arguments dispositive, and therefore do not address the others.

### a.    Unreasonable delay

The Defendant argues that the government unreasonably delayed in asking for a warrant to search the laptop. [DE 51, p. 19]. On the record before this Court, I must agree, and I therefore recommend that the evidence seized from that computer be suppressed.

---

[22] The items listed on that Attachment B were identical to items 1 though 11, and 13, on Attachment B to Agent Wilkins' affidavit.

[23] Again, Defendant challenges this warrant application as lacking probable cause, he argues that the warrantless preview search of the laptop at the airport was in violation of the Fourth Amendment (and not a true border search, as claimed by the government), he claims this warrant was also overbroad, and that the search was unlawfully conducted after the fourteen-day deadline set forth in Rule 41.

27

The laptop computer was seized at the airport, on July 8, 2009. Forty-one days later, on August 18, 2009, ICE agents applied for and received the search warrant for that computer. The government offered no explanation for the forty-one day delay in applying for that search warrant and presented no evidence in this regard, nor did it address this aspect of the Defendant's Motion in its memorandum in opposition to the Motion.

This Circuit recently recognized that "even a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable searches.'" *United States v. Mitchell*, 565 F. 3d 1347, 1350 (11th Cir. 2009) (quoting *United States v. Jacobsen*, 466 U.S. 109, 124 (U.S. 1984)). In *Mitchell*, the Court recognized that an unreasonable delay in securing a search warrant can violate the Fourth Amendment, and directed that:

> [t]he reasonableness of the delay is determined in light of all the facts and circumstances, and on a case-by-case basis. The reasonableness determination will reflect a careful balancing of governmental and private interests.

*Id.* at 1351 (quotation marks and citations omitted).

In *Mitchell*, two agents (West and Hayes) seized the hard drive of the defendant's computer, at noon on a Thursday, acting on undisputed probable cause that the computer contained images of child pornography. The following Sunday, Agent West left town to attend a two-week training course. Three days after his return from training - which was 21 days after the initial seizure of the hard drive, Agent West applied for and received a warrant

28

to search the computer. The court observed that all but three pages of the twenty-three page affidavit in support of the search warrant, were boilerplate text, taken from another affidavit. The court further found that the government had not justified the delay: Agent West could have applied for the warrant before his scheduled departure for training, or another agent, such as Agent Hayes, could have made that application in Agent West's absence. Although Agent West was the only agent in that district trained to conduct a forensic examination of the computer for child pornography, and thus could not have undertaken the search until after his return from his travels, the Court specifically rejected the argument that there was no harm caused by the delay in applying for the search warrant.

> [T]he purpose of securing a search warrant soon after a suspect is dispossessed of a closed container reasonably believed to contain contraband is to ensure its prompt return should the search reveal no such incriminating evidence, for in that event the government would be obligated to return the container (unless it had some other evidentiary value). . . . If anything, this consideration applies with even greater force to the hard drive of a computer, which is the digital equivalent of its owner's home, capable of holding a universe of private information.

*Id.* at 1352 (quotation marks and citations omitted). The court balanced the absence of governmental justification for the delay, against the "significant interference with [the defendant's] possessory interest" in the computer. *Id.* at 1351. In this regard, the Court noted the unique role of computers, and our heavy reliance on them for personal and business use. *Id.* Applying a "rule of reasonableness that is dependent upon all the circumstances" *Id.* at 1352, the Court found that the twenty-one day delay, on the record before it, was

unreasonable, and therefore held that the Motion to suppress should have been granted.[24]

The *Mitchell* Court found "no compelling justification for the [twenty-one day] delay." *Id*. at 1351. In contrast, the government here provided *no* justification for its forty-one day delay. As in *Mitchell*, the application for the laptop was mostly boilerplate; to be more accurate, it largely was a restatement of Agent Wilkins' application to search the Defendant's home. At most, this application required an hour or two of government effort. Agent Alvaro was not the only agent who could have prepared this application; Agent Lowen was at the airport when the laptop was seized and he could have applied for the search warrant; in fact, the application could have been prepared by any ICE agent who took the time to review the evidence summarized in the application. Balanced against this absence of any justification for the delay is the Defendant's clear possessory interest in the laptop, important enough to the Defendant to have brought it with him on his travels abroad. On this record, the balance of competing interests leads to the clear conclusion that the forty-one delay was patently unreasonable. For this reason, I recommend that the Court grant the Defendant's Motion to Suppress evidence seized from the laptop.

**4.    Defendant's post-arrest statements**

On July 8, 2009, at the airport, after Agent Flores seized the Defendant's laptop computer, he placed the Defendant under arrest. Agent Flores testified that Agent Lowen then "stated *Miranda* rights" to the Defendant. [Tr. p. 33]. According to Agent Flores,

---

[24] This Circuit has recently reaffirmed its holding in *Mitchell*. *See United States v. Vallimont*, No. 09-14415, 2010 U.S. App. LEXIS 9651 *2-4, (11th Cir. May 11, 2010).

Agent Lowen did not have a *Miranda* card with him, or otherwise have a written statement of those rights with him. Thus, Agent Lowen recited those rights from memory. Surprisingly, Agent Flores could offer very little information on this subject, and Agent Lowen did not testify at the suppression hearing.[25] The following was asked of Agent Flores:

Q.   Can you tell us verbatim what the rights were that Agent Lowen gave to Mr. Rubinstein?

A.   I cannot, as I didn't state them myself.

Q.   Okay. Were you in the room when Agent Lowen told him his rights?

A.   I was.

Q.   Okay. Nonetheless, you can't tell us specifically which rights were advised to Mr. Rubinstein, or using what language?

A.   Well, I can't recall myself. It was in English, though.

[Tr. p. 73]. According to Agent Flores, after the Defendant was told of his *Miranda* rights, he answered a couple questions that Agent Lowen asked about the Defendant's computer usage, at which point the Defendant asked for an attorney, and the agents stopped their questioning. [Tr. p. 35].

Defendant testified that he was not told his *Miranda* rights. [Tr. pp. 126-27]. The Defendant acknowledged answering the agents' questions, after which he asked to speak with a lawyer. He agreed that he was not asked anything further after that point. [Tr. pp. 127-31].

---

[25] In fact, the government's evidence on this subject was shockingly brief, comprising two pages of the double-spaced transcript. [Tr. pp. 33-34; 73].

31

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), before beginning a custodial interrogation, law enforcement officers must warn the subject that he has the right to remain silent and the right to have an attorney present during questioning.[26] An individual can effectively waive his *Miranda* rights if his waiver is voluntary, knowing and intelligent. *United States v. Rush*, 144 Fed. Appx. 13, 15 (11th Cir. 2005); *United States v. Beale*, 921 F.2d 1412, 1434 (11th Cir. 1991). The government must prove, by a preponderance of the evidence that an uncounseled Defendant was advised of those rights, and waived them voluntarily, knowingly and intelligently. *United States v. Glover*, 431 F. 3d 744, 748 (11th Cir. 2005); *United States v. Barbour*, 70 F. 3d 580, 584 (11th Cir. 1995).

The government has not met that burden of proof here. It did not put forward a witness to definitively tell this Court what rights the Defendant was advised of. Agent Flores could only say that Agent Lowen advised the Defendant of some *Miranda* rights, and did so in English. The Defendant flatly contradicted this with his own testimony. On this record, the question is not even a close call. The government did not meet its obligation at the suppression hearing, and therefore, I recommend that the Motion to Suppress the Defendant's post-arrest statements be granted.

---

[26] The specific rights listed on a *Miranda* form, commonly carried by law enforcement officials, are as follows: (1) that the subject has the right to remain silent; (2) that anything he said could be introduced into evidence against him in court; (3) that he had the right to have an attorney to represent him at any time during questioning; and (4) that if he wanted an attorney but could not afford one, one would be provided without charge. *See Hart v. AG*, 323 F.3d 884, 887 (11th Cir. 2003).

## 5.    Conclusion

For the reasons given, I RECOMMEND that the Defendant's Amended Omnibus

Pretrial Motions to Suppress Evidence [DE 51], be granted in part and denied in part.

Specifically, I recommend that: (1) the Motion to Suppress the evidence seized from the

Defendant's home, including his desktop computer, be **DENIED**; (2) the Motion to Suppress

the evidence seized from the laptop computer, be **GRANTED**; and (3) the Motion to

Suppress the Defendant's post-arrest statements, be **GRANTED**.

## 6.    Objections

The parties may file written objections to this Report and Recommendation with the

Honorable Alan S. Gold **no later than June 30, 2010.**  Each party may file a response to the

other party's objection, **no later than July 5, 2010.**[27]  Failure to timely file objections shall

bar the parties from attacking on appeal any factual findings contained herein.  *RTC v.*

*Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d

745, 749-50 (11th Cir. 1988).

RESPECTFULLY RECOMMENDED in chambers at Miami, Florida this 23rd day

of June, 2010.

CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE

cc:    The Honorable Alan S. Gold
       All counsel of record

[27] Because this case is set for trial on July 19, 2010, with a pretrial conference to be held on July 7, 2010, an expedited objection and response schedule is required.

33